Case 2:21-mj-05453-DUTY *SEALED* Document 1 *SEALED* Filed 12/01/21 Page 1 of 81 Page ID #:1
AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means
Page ID #:1

# UNITED STATES DISTRICT COURT

for the

Central District of California

<table>
<tr><td>In the Matter of the Search of</td><td>)</td><td rowspan="5"></td></tr>
<tr><td><em>THE PERSON KNOWN AS:</em></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td><em>MUCKTARR KATHER SEI, also known as</em></td><td>)</td></tr>
<tr><td><em>"Kather Sei" ("SEI")</em></td><td>)</td></tr>
</table>

Case No. 2:21-MJ-05453

**FILED**
CLERK, U.S. DISTRICT COURT

December 1, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ em ___ DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> *See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of Controlled Substances and Distribution of Controlled Substances Resulting in Death |
| 21 U.S.C. § 846 | Conspiracy and Attempt to Distribute Controlled Substances |

The application is based on these facts:

> *See attached Affidavit*

- ☒ Continued on the attached sheet.

- ☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/S/ CALEB D. HODGSON

*Applicant's signature*

**Caleb D. Hodgson, DEA**

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 12/01/2021

*Judge's signature*

City and state: Los Angeles, CA

Hon. Patricia Donahue, U.S. Magistrate Judge

*Printed name and title*

AUSA: Patrick Castañeda – x0637

## <u>ATTACHMENT A-1</u>

<u>PERSON TO BE SEARCHED</u>

The person to be searched is Mucktarr Kather Sei, also known as "Kather Sei" ("SEI"), 36 years old, approximately 5'10" with black hair, and brown eyes, depicted below:



The search of the aforementioned person shall include any and all clothing and personal belongings, including any digital devices, backpacks, wallets, briefcases and bags that are within SEI's immediate vicinity and control at the location where the search warrant is executed. It shall not include a body cavity or strip search.

i

## ATTACHMENT B

I.   **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Distribution of Controlled Substances and Distribution of Controlled Substances Resulting in Death); and 846 (Conspiracy and Attempt to Distribute Controlled Substances) (the "Subject Offenses"), namely:

a.    Any controlled substance, controlled substance analogue, or listed chemical;

b.    Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.    Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.    United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

ii

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

       e.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

       f.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

       g.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

       h.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook,

iii

Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

i.   Audio recordings, pictures, video recordings, or
still captured images related to the purchase, sale,
transportation, or distribution of drugs;

j.   Contents of any calendar or date book;

k.   Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations; and

l.   Any digital device which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the Subject Offenses, and forensic copies thereof.

m.   With respect to any digital device containing
evidence falling within the scope of the foregoing categories of
items to be seized:

i.   evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,

iv

as well as evidence of the presence or absence of security
software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

        vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

        viii.    records of or information about
Internet Protocol addresses used by the device;

        ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.   **SEARCH PROCEDURE FOR DIGITAL DEVICE(S)**

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

      b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

        i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

      d.   If the search determines that a digital device does not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to

viii

law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

    6.   In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

        a.   Any digital device capable of being used to
commit, further, or store evidence of the offense(s) listed
above;

        b.   Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

        c.   Any magnetic, electronic, or optical storage
device capable of storing digital data;

        d.   Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

        e.   Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

        f.   Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

ix

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Mucktarr Kather Sei's, also known as "Kather Sei" ("SEI"), thumb and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of SEI's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x

# **AFFIDAVIT**

I, Caleb D. Hodgson, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of an application for warrants to search the following person, premises, and vehicle, as described more fully in Attachments A-1 to A-3:

a. The person of Mucktarr Kather Sei, also known as "Kather Sei" ("SEI"), as described more fully in Attachment A-1;

b. 333 South Saint Andrews Place, Apt. #222, Los Angeles, CA 90020-4368 (the "SUBJECT PREMISES"), as described more fully in Attachment A-2; and

c. White, four-door, 2015 Honda Civic, bearing California License Plate Number 7JWT414, Vehicle Identification Number ("VIN") 19XFB2F58FE223762 (the "SUBJECT VEHICLE"), as described more fully in Attachment A-3.

2. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Distribution of Controlled Substances and Distribution of Controlled Substances Resulting in Death); and 21 U.S.C. § 846 (Conspiracy and Attempt to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1 to A-3, as well as Attachment B, are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

4.    I am an investigator or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516. I am certified by the California Attorney General to conduct wiretaps as authorized in section 629.50 et seq. of the California Penal Code.

5.    I am a Special Agent ("SA") with the U.S. Drug Enforcement Administration ("DEA"). I have held this position since October 2019. I am currently assigned to the Los Angeles Field Division Southern California Drug Task Force/High Intensity Drug Trafficking Area ("HIDTA") Group 52, an enforcement group that investigates drug traffickers, drug manufacturers, and drug trafficking organizations. HIDTA is a task force comprised of agents, officers, detectives, and/or investigators from the DEA, the Federal Bureau of Investigations ("FBI"), the Internal Revenue Service ("IRS"), Homeland Security Investigations ("HSI"), the Los Angeles Police Department ("LAPD"), the Los Angeles Sheriff's Department ("LASD"), and

several other law enforcement agencies. Prior to working for the DEA, I was employed as a criminal intelligence analyst for the Kentucky Intelligence Fusion Center, under the Kentucky Office of Homeland Security, specializing in organized crime intelligence collection and analysis. I held this position for just under two years before joining DEA.

6.  I have completed DEA Basic Agent Training, an 18-week intensive training program at the DEA Training Academy in Quantico, Virginia, during which I received over 300 hours of comprehensive, formalized instruction in such matters as drug identification; drug trafficking and interdiction; surveillance; criminal law; money laundering techniques; and asset identification, seizure and forfeiture, among other subjects.

7.  Through my work at DEA, I have also conferred and interacted with experienced special agents, federal DEA Task Force Officers ("TFOs"), and local law enforcement investigators regarding the investigation of drug-trafficking offenses. During my tenure at DEA, I have been involved in investigations regarding (1) the unlawful importation, exportation, manufacture, possession with intent to distribute, and distribution of narcotics, (2) the laundering of narcotics proceeds and monetary instruments derived from narcotics activities, and (3) conspiracies associated with narcotics offenses. My involvement in these investigations has included debriefing defendants, witnesses, and confidential sources; conducting physical and electronic surveillance; assisting in court-authorized interceptions; executing search and arrest

warrants; seizing narcotics and narcotics-related assets; making arrests for narcotics-related offenses; and analyzing documents and records related to drug-trafficking activities and money laundering.

8.    Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, both in the United States and elsewhere, I have become familiar with drug traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of illegal drugs, the collection of money that represents the proceeds of drug trafficking, and money laundering techniques. I am aware of sophisticated tactics that drug traffickers routinely use in attempts to thwart law enforcement investigations of their drug trafficking organizations, including the use of counter surveillance techniques, hidden vehicle compartments, elaborately planned smuggling schemes tied to legitimate businesses, and false or fictitious identities.

9.    I know that drug traffickers frequently use cellular telephones to arrange transportation and deliveries of illegal drugs and the proceeds derived from their sale, and they frequently change telephones in an effort to avoid detection by law enforcement. Drug traffickers also frequently use coded language in their communications when referencing illegal drugs in order to disguise their conversations about illegal drugs as well as the proceeds obtained from their sale. I know that that know that drug traffickers are also often aware that law

4

enforcement monitors telephones in an effort to identify illegal activity. I know that drug traffickers frequently use false or fictitious names/identities or family and/or friends' names when obtaining cellular telephones in an effort to avoid detection by law enforcement.

10.   The facts set forth in this affidavit are based upon my personal knowledge, my training and experience, information obtained from public records and information I obtained from other law enforcement officers or individuals. The information in this affidavit is merely intended to show that there is sufficient probable cause for the accompanying warrant. This affidavit is not a complete statement of all of the facts related to this matter. Unless specifically indicated otherwise, all facts, conversations, and statements described in this affidavit are related in substance and in part only.

### III.  SUMMARY OF PROBABLE CAUSE

11.   On or about November 16, 2020, victim R.M. was found dead of a suspected drug overdose in his home in Beverly Hills, California. Leftover pills seized from the scene by investigators later tested positive for fentanyl, and the Los Angeles County Medical Examiner Coroner's Office (the "Coroner's Office") ultimately ascribed R.M.'s death to the effects of ethanol, clonazepam, and fentanyl.

12.   After R.M.'s death, R.M.'s family provided investigators with screenshots of iMessages from R.M.'s iCloud account ("iCloud Account 2"), which is linked to his phone

number ending -1671,[1] showing communications with phone number
323-688-9519, which law enforcement later linked to Mirela
TODOROVA and her iCloud account ("iCloud Account 1").[2]

13. In the iMessages, TODOROVA's iCloud Account 1
coordinated the delivery of purported oxycodone pills to R.M. at
his Beverly Hills home via a courier driving a "white Honda"
later identified as the SUBJECT VEHICLE belonging to SEI.

14. R.M.'s family also provided investigators with Ring
camera footage from R.M.'s home from the night of the November
15, 2020 drug sale, which shows a white Honda sedan with tinted
windows, later identified as the SUBJECT VEHICLE belong to SEI,
arriving at R.M.'s home consistent with the iMessages between
TODOROVA's and R.M.'s respective iCloud accounts at 10:25 p.m.
and again at 12:01 a.m., on November 16, 2020. Investigators
believe the SUBJECT VEHICLE belongs to SEI based on California
Department of Motor Vehicle ("DMV") records, Beverly Hills
Police Department license plate reader ("LPR") technology,
court-authorized historical cell site data of SEI's cellphone
number 732-763-1328, which is linked to SEI's iCloud account
("iCloud Account 3"),[3] and another cellphone number linked to a

---

[1] iCloud Account 2 was an account believed to be used by
R.M., identified by phone number 310-993-1671, associated with
the Apple ID ray.mascolo@gmail.com and Destination Signaling
Identifier ("DSID") 1450780410.

[2] iCloud Account 1 was an account believed to be used by
Mimi Todorova, also known as Mirela Todorova ("TODOROVA"),
identified by the phone number 323-688-9519, associated with
Apple ID johnmitchell123@mail.com and DSID 16097786049.

[3] iCloud Account 3 is an account believed to be used by
Mucktarr Kather Sei, also known as "Kather Sei" ("SEI"),
identified by the phone number 732-763-1328, associated with the
Apple ID kathersei@yahoo.com and DSID 1075216694.

digital device seized from TODOROVA's apartment in March 2021, identified below as "Digital Device 1," but believed to be used by SEI to contact R.M. in furtherance of the second drug delivery to R.M. on November 16, 2021.

15.  On March 19, 2021, the Honorable Alexander F. MacKinnon, United States Magistrate Judge for the United States District Court for the Central District of California, signed search warrants for TODOROVA's person, apartment, and car in Case Numbers 2:21-MJ-01349, 2:21-MJ-01351, and 2:21-MJ-01352, respectively. Upon executing the search warrant for TODOROVA's apartment, law enforcement officers seized about 52 drug exhibits in her residence, including drugs that later tested positive for cocaine and MDMA. Investigators also seized additional digital devices from TODOROVA's apartment, including a cellphone identified below as "Digital Device 1," which investigators later determined called R.M. as the SUBJECT VEHICLE can be seen arriving at R.M.'s home at about 12:01 a.m. Investigators also obtained court-authorized historical cell site data for Digital Device 1 and SEI's cellphone, both of which shows the phones located in close proximity to R.M.'s home around that time.

16.  Upon executing the search warrant for TODOROVA's person and car, investigators found and seized TODOROVA's cellphone linked to TODOROVA's iCloud Account 1. Shortly thereafter, I reviewed the cellphone's contents and saw the following in pertinent part:

      a.   iMessages between TODOROVA's and R.M.'s respective iCloud accounts involving the drug sales on November 15, 2020, along with numerous other iMessages regarding other drug sales and customers; and

      b.   iMessages between TODOROVA's iCloud Account 1 and several of her saved contacts containing the word "Driver" in their respective contact names. One of the contacts included "Kather Driver," which corresponds to the phone number linked to SEI's iCloud Account 3. Another "Driver" contact included an individual ("Courier A") whom investigators saw with TODOROVA during surveillance of TODOROVA on March 10, 2021, and later interviewed as detailed below.[4]

    17.  On May 18, 2021, TODOROVA was charged in an indictment with possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii), possession with intent to distribute MDMA, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and criminal forfeiture, in violation of 21 U.S.C. §

---

[4] Courier A voluntarily agreed to speak with law enforcement and appeared cooperative. DEA has not enlisted Courier A as a source. At present, Courier A is not receiving monetary compensation or judicial consideration. Courier A showed investigators text messages and photographs corroborating some of Courier A's statements. Courier A also confirmed being present with TODOROVA on March 10, 2021, as seen by an investigator surveilling TODOROVA. Based on available criminal history reports, Courier A has a dated and minor criminal history in New York and Massachusetts. Courier A was arrested on February 2, 2016, in New York, New York and appears to have convictions for intent to obtain transportation without paying (misdemeanor), criminal trespass (misdemeanor), disorderly conduct (violation), and general violation of local law (violation). There also appears to be an open bench warrant related to these violations. Courier A was arrested on October 31, 2010, in Boston, Massachusetts for drinking alcoholic beverages in public, but no further information on this charge is available on the criminal history report.

853, all arising out of the execution of the above-mentioned search warrant on her apartment.

18. On May 20, 2021, the Honorable Margo A. Rocconi, United States Magistrate Judge for the United States District Court for the Central District of California, signed search warrants for historical cell-site location data for SEI's phone (linked to iCloud Account 3), Digital Device 1, and R.M.'s phone (linked to iCloud Account 2), in Case Number 2:21-MJ-02499, and for prospective cell-site location data and use of a cell-site simulator for SEI's phone (linked to iCloud Account 3), in Case Number 2:21-MJ-02500. As detailed below, subsequent investigation revealed that days prior to the drug distribution to R.M., SEI's phone pinged near the SUBJECT PREMISES and TODOROVA's Apartment. On the night of the drug distribution to R.M., both SEI's phone and Digital Device 1 pinged near R.M.'s residence. And after the drug distribution to R.M., both SEI's phone and Digital Device 1 pinged near the SUBJECT PREMISES:

19. As described further below, multiple surveillances and spot checks have placed SEI and SEI's phone linked to iCloud Account 3 at the SUBJECT PREMISES. Investigators also observed SEI traveling in the SUBJECT VEHICLE and received GPS location information indicating SEI's phone had moved away from the SUBJECT PREMISES and was in the same area as SEI and the SUBJECT VEHICLE.

20. Upon further investigation, I confirmed SEI's connection to iCloud Account 3 via Apple records and subscriber information from T-Mobile. I also identified numerous contacts

between SEI's number linked to iCloud Account 3 and TODOROVA's number linked to iCloud Account 1 via toll records, as well as contacts between SEI's and TODOROVA's Peer to Peer ("P2P") financial services. Related records show that TODOROVA's and SEI's respective P2P accounts share some of the same identifiers as their respective iCloud Account 1 and iCloud Account 3.

21.  On or about September 23, 2021, while conducting active surveillance of SEI, I sent a text message acting in an undercover capacity to SEI's phone number linked to iCloud Account 3. In this text message conversation, as a response to SEI asking, "I'm sorry who is this?," I said "Kather right? One of my buddies passed me your number." SEI responded in the affirmative to the "Kather" reference with "Yup!" I later reviewed toll records for SEI's iCloud Account 3 for this time period and confirmed that the text messages between myself and SEI were logged on the toll records.

22.  On October 22, 2021, SA Howell and I interviewed Courier A identified above. Courier A explained working for TODOROVA as a drug delivery driver during the period of March 10-13, 2021, and showed us messages with TODOROVA on a cell phone corroborating Courier A's experience with TODOROVA. Courier A explained that March 10, 2021, was the first night working for TODOROVA and that she provided a work cell phone and a bag containing "product" for each of the shifts worked. Shifts were approximately 8 hours long and had a pay rate of $300 a shift, or $37.50 an hour. TODOROVA instructed and guided Courier A in communicating with clients, using shared contacts and notes

applications in the work phone, taking payments, and would
resupply Courier A with more illegal drugs for distribution when
Courier A would run out during a shift. Courier A would return
to TODOROVA's apartment complex and receive more illegal drugs
from her there, but only staying outside the apartment complex
and never going inside.

23. As of November 30, 2021, SEI's phone linked to iCloud
Account 3 is still active and linked to him.

24. In sum, while living at the SUBJECT PREMISES, I
believe SEI participated as a driver/courier in the TODOROVA
drug trafficking organization ("TODOROVA DTO") operating in the
Greater Los Angeles area and possibly elsewhere. As part of the
DTO, SEI worked for TODOROVA and used the SUBJECT VEHICLE, to
deliver drugs to customers, including R.M., and received illegal
drugs and a work cellphone, believed to be Digital Device 1,
from TODOROVA connected to and/or having access to TODOROVA's
iCloud Account 1 in order to perform these tasks for the
TODOROVA DTO.

## IV. STATEMENT OF PROBABLE CAUSE

25. Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

### A. R.M. Dies of a Drug Overdose

26. On November 16, 2020, one of victim R.M.'s assistants
-- D.G. -- arrived at R.M.'s home in Beverly Hills, California,
at about 11:00 a.m., discovered that R.M. was unconscious and
unresponsive on the kitchen floor, and placed an emergency call

to 911. Los Angeles Fire Department Rescue Ambulance 71 arrived
at the scene, attempted treatment, and ultimately pronounced
R.M.'s death at approximately 11:18 a.m.

27. LAPD officers and the Coroner's Office also responded
to the scene. The Coroner's Office Investigator, Kristina
McGuire, collected the items from the scene, which eventually
became DEA Drug Exhibits 1-7 and which included, among other
items, blue pills with "M" and "30" stamps consistent with
oxycodone that the DEA Southwest laboratory later determined to
test positive for fentanyl.

28. On January 21, 2021, at approximately 4:51 pm, SA
David Dansart received an email from the LAMEC Coroner's Office
with an electronic copy of the autopsy report for R.M. The
report noted the presence of fentanyl in R.M.'s blood and
"ascribe[d] the death to: EFFECTS OF ETHANOL, CLONAZEPAM AND
FENTANYL."

**B.      The Night Before R.M.'s Death, iMessages between
         TODOROVA's iCloud Account 1 and R.M.'s iCloud Account
         2 Show Communications regarding the Sale and Delivery
         of Drugs to R.M. via Courier**

29. On November 19, 2020, SA Dansart and I met with K.M.
(decedent's mother), B.M. (decedent's father), and two family
assistants -- J.G. and D.R. -- at decedent's family residence,
located in Los Angeles. K.M. signed two DEA-88 Consent to Search
forms, as witnessed by J.G. and D.R., for two of R.M.'s phones:
(1) an iPhone 11 with a number ending in -7097; and (2) an
iPhone Xs with a number ending in -1671, which is linked to

Case 2:21-mj-05453-DUTY *SEALED* Document 1 Filed 12/01/21 Page 24 of 82 Page ID #:24
Page ID #:24

iCloud Account 2. These phones were later taken into DEA custody on February 25, 2021.

     a.   On December 4, 2020, SA Dansart spoke on the phone with D.R., who said that R.M.'s family and assistants had gained access to R.M.'s laptop by guessing the password to the laptop. After gaining access to the laptop, they obtained access to iCloud Account 2 and discovered iMessages between R.M. and 323-688-9519, which is linked to TODOROVA's iCloud Account 1, from the night of November 15, 2020 regarding the drug sale.

     b.   At all times relevant to this affidavit, iCloud Account 1 was associated with 323-688-9519, which is TODOROVA's cellphone number. At the time of the above-described messages, TODOROVA's cellphone number was serviced by T-Mobile (the "T-Mobile Telephone"). Based on information obtained from T-Mobile, I know that T-Mobile was the service provider for the T-Mobile Telephone on November 15, 2020. Additionally, according to the information obtained from T-Mobile, I know that the T-Mobile Telephone account began approximately on March 21, 2016. While there was no subscriber information available for the T-Mobile Telephone, I believe TODOROVA was the user of the T-Mobile Telephone based on (i) information obtained from law enforcement databases, and (ii) on February 25, 2021, I accessed R.M.'s iPhone Xs referenced above which was connected to iCloud Account 2, and using the passcode provided by R.M.'s family,[5] I discovered that the T-Mobile Telephone was saved as contact

---

[5] On January 21, 2021, SA Dansart spoke on the phone with R.M.'s family assistant J.G., who provided the passcode for the iPhone Xs.

"Mimi Snowie" in R.M.'s iPhone Xs. The contact information for "Mimi Snowie" lists the T-Mobile Telephone as the mobile phone number, the email address "123mimi@gmail.com" is under the contact card info, and in the "Notes" section under the contact card, it says "real names Mirela Todorova."

c. Furthermore, a review of the California Department of Motor Vehicles ("DMV") image record for Mirela TODOROVA shows that she signed her name as "Mimi Todorova":



SIGNATURE:



FINGERPRINT:

d. R.M. used "Mimi" in a message on November 15, 2020, while communicating with the T-Mobile Telephone. As described further below, TODOROVA changed the carrier for the phone number for the T-Mobile Telephone from T-Mobile to AT&T on December 12, 2020 (the "AT&T Telephone") and continued to message R.M.'s phone from the AT&T Telephone. AT&T subscriber data also confirms TODOROVA's name and email.

e. I later obtained records from Apple which show that the email address johnmitchell123@mail.com is associated with the DSID 16097786049 (iCloud Account 1). I have learned through my training and experience that a DSID is a unique ID

14

generated when registering at iCloud.com and assigned to the
user. According to the records from Apple, both the email
address and DSID are associated with "Mimi Todorova" with an
address listed of "6201 Hollywood Blvd, Los Angeles, CA 90028-
5361" ("TODOROVA's Apartment") and telephone number "323-688-
9519." Additionally, an iPhone 12 Pro Max is listed as
associated with all the above identifiers and Apple provides
serial number "G0NDN1BK0D48" and part number "MGCQ3LL/A" for
this device. As noted further below, TODOROVA's AT&T Telephone
was seized pursuant to a search warrant. Upon my initial review
of the phone, I saw and photographed a settings screen showing
specific information for TODOROVA's AT&T Telephone and it
matches these numbers provided by Apple as seen in the following
photograph:



30. On December 10, 2020, SA Dansart and I met with J.G. and received a Universal Serial Bus ("USB") drive that contained the screenshots of iMessage communications between R.M. and the T-Mobile Telephone taken from R.M.'s iCloud account as noted in the previous paragraph. SA Dansart and I reviewed these screenshots as detailed below and then provided the USB drive to LAPD.[6]

31. Screenshots taken from R.M.'s iCloud Account 2 show iMessages on November 15 and 16, 2021, with phone number ending in 9519, identified above as linked to TODOROVA's iCloud Account 1, regarding drug prices, sales, and delivery. On February 25, 2021, I accessed R.M.'s iPhone Xs and confirmed that the messages displayed in the screenshots provided by the family were accurate. Accessing the iPhone Xs also provided the specific timestamps for each incoming and outgoing message between R.M. and TODOROVA.

    a. I later obtained records from Apple which show that the email address ray.mascolo@gmail.com is associated with the DSID 1450780410 (iCloud Account 2). As noted above, I have learned through my training and experience that a DSID is a unique ID generated when registering at iCloud.com and assigned to the user. According to the records from Apple, both the email address and DSID are associated with R.M. "310-993-1671."

32. Based on a review of these iMessages, in sum and substance, R.M. contacted his contact saved as "Mimi Snowie,"

---

[6] As noted below, after providing the USB drive to LAPD, DEA took custody of the USB drive on February 25, 2021.

identified above as TODOROVA's iCloud Account 1,[7] on November 15, 2020, at about 7:56 p.m., seeking drugs. Mimi Snowie responded with a list of various drugs, including "oxy blues," and their corresponding prices and also stated "Delivery available" with a "Delivery fee $30" and "Cash, CashApp, Apple Pay, Zelle, Paypal or Venmo." Based on my training and experience, I am familiar with the coded language used by drug dealers to refer to certain types of drugs. For example, I know that "oxy blues" refers to Oxycodone or OxyContin. I know that Oxycodone is often blue in color and has markings "M" on one side and "30" on the other side. I also know that illegal drug traffickers and manufacturers are known to create copycat pills that resemble pharmaceutical Oxycodone and that these pills are often made with fentanyl. As noted above, items seized from the death scene included blue pills with "M" and "30" stamps consistent with oxycodone but which later tested positive for fentanyl. In addition to the "oxy blues," Mimi Snowie's drug list had "C" listed at $100. Based on my training and experience, I know that "C" refers to cocaine.

33. At 8:05 p.m., R.M. requested two "Oxy blues" from Mimi Snowie along with "40 blow." Based on my training and experience, I know that "blow" often is a slang term for cocaine. As the iMessages continued, Mimi Snowie stated that bags are measured in "full g's." Based on my training and

---

[7] As noted above, R.M.'s contact entry for "Mimi Snowie" also identified TODOROVA's email address "123mimi@gmail.com" and in the "Notes" section under the contact card, it says "real names Mirela Todorova."

experience, I know that "full g's" refers to the full grams. Additionally, Mimi Snowie noted that halves are not available for sale, meaning half-gram quantities. Mimi Snowie gives the sale price for the transaction: $60 for the two "Oxy blues" (based on the price list given in a previous message) and $100 for "1 g" making $160 total for the illegal drugs, plus a delivery fee, for a grand total of $190. I believe that the "1 g" is one gram of cocaine, as "C" is mentioned as being for sale at $100. Based on my training and experience, and after consulting with DEA Intelligence Research Specialist ("IRS") Charles Fellows regarding illegal drug prices in the Los Angeles area, I know that the prices listed for these drugs are consistent with the Los Angeles area illegal drug market.

34. At about 9:50 p.m., Mimi Snowie texted R.M., "My driver can be there in 10mins still want it?" R.M. replied in the affirmative. At 10:22 p.m., Mimi Snowie texted R.M., "Pulling up in 2mins white Honda." At 10:27 p.m., Mimi Snowie texted R.M., "Driver is outside." At 10:28 p.m., R.M. texted Mimi Snowie saying "Coming". As detailed below, Ring camera footage from R.M.'s home show the White Honda arriving at the house at 10:25 p.m. and R.M. exiting his home and entering the White Honda outside shortly thereafter.

35. At 10:53 p.m., R.M. messaged Mimi Snowie and requested to trade the "G of lady," which I know to be a gram of cocaine based on my training and experience, for "5 blues," which I believe to mean oxycodone based on my training and experience. TODOROVA replied that the delivery driver would return "after

next delivery," and at approximately 12:01 a.m. on November 16, 2020, Mimi Snowie messaged R.M., "Driver outside."

36.  As described above, less than twelve hours after the last message from Mimi Snowie, R.M. was pronounced dead at 11:18 a.m. on November 16, 2020.

37.  Based on my training and experience, I believe TODOROVA provided controlled substances to R.M. through the use of a delivery driver acting at her direction. Furthermore, based on additional investigation efforts described below, I believe the delivery driver was SEI, driving his 2015 white Honda Civic sedan, bearing California license plate number 7JWT414 ("SEI's Car"), which is registered to him per California Department of Motor Vehicle ("DMV") records.

**C.    After R.M.'s Death, TODOROVA's 9519 Number Linked to Her iCloud Account 1 Sends an iMessage and Text Message to R.M.'s Number Advertising More Drugs**

38.  On January 26, 2021, at approximately 5:23 pm, SA Dansart received an email from K.M. containing a screenshot of an iMessage and a text message sent from TODOROVA's cellphone number linked to iCloud Account 1 to R.M.'s cellphone number ending in -1671, which is linked to iCloud Account 2. The screenshots show TODOROVA advertising various drugs for sale, including "C" and "blues." The messages further state "Delivery available every night" and "Most payment methods accepted."

a.    As noted above, investigators determined that the carrier for TODOROVA's cellphone number was switched from T-Mobile Telephone to AT&T over a month earlier on December 12, 2020. Subscriber data for the AT&T Telephone identified TODOROVA

as the subscriber, the address associated with TODOROVA as 6201
Hollywood Boulevard #2406, Los Angeles, California 90028
("TODOROVA's Apartment"), the IMSI number as 310410672649897
until March 5, 2021,[8] the service start date as December 12,
2020, and the associated email address "123mimi@gmail.com,"
which is the same email address I found in R.M.'s iPhone Xs
contact entry for the T-Mobile Telephone saved as "Mimi Snowie,"
as noted above. TODOROVA's Apartment is located within the
Eastown Apartment Complex. Furthermore, a review of the DMV
image record for Mirela TODOROVA shows that she signed her name
as "Mimi Todorova," and R.M. used "Mimi" in an aforementioned
message on November 15, 2020, while communicating with the T-
Mobile Telephone. Additionally, a comparison of toll records for
the T-Mobile Telephone (for the period of November 3, 2020
through December 4, 2020) and the AT&T Telephone (for the period
of December 11, 2020 through January 10, 2021) shows at least
fifteen common contacts for the T-Mobile Telephone and the AT&T
Telephone in the records from both companies.[9]

     39.  On January 27, 2021, at approximately 3:03 pm, SA
Dansart spoke with K.M. and her personal assistant D.R.
regarding the aforementioned email and screenshots. They
informed SA Dansart that since K.M. is the account holder, she

---

[8] According to AT&T records, the IMSI changed from
310410672649897 to 310410672631473 on approximately March 5,
2021. TODOROVA arrived back in the United States on March 4,
2021.

[9] SA Dansart conducted a partial comparison and not a
complete comparison of all toll records for the T-Mobile
Telephone and the AT&T Telephone.

was able to and did transfer decedent R.M.'s phone number ending -1671 to another device, later determined to be an iPhone S, in order to monitor any incoming messages. K.M. emphasized that this was only to monitor messages and not to respond to any that the phone might receive.

40. On February 19, 2021, SA Dansart and I met with B.M. and a family assistant -- S.D. -- at the decedent's family residence and took custody of the above-mentioned iPhone S to which K.M. had transferred R.M.'s phone number and the Apple Macbook Pro laptop through which decedent's family accessed R.M.'s iCloud Account 2 as previously mentioned. B.M. signed a DEA-88 Consent to Search form for these devices.[10]

41. On February 25, 2021, I accessed the iPhone S that had received these messages and confirmed that the messages displayed in the screenshots provided by the family were accurate. TODOROVA's number linked to iCloud Account 1 sent messages to R.M.'s number on December 16, 2020 and January 26, 2021.[11] Based on my training and experience, both messages from the AT&T Telephone contain numerous slang terms for illegal

---

[10] On February 25, 2021, TFO Alex Pozo and TFO David Holmes met with B.M., K.M., and S.D. to sign a new DEA-88 Consent to Search form. Only one witness was available at the time B.M. signed the form on February 19, 2021, so B.M. signed a new form with two witnesses on February 25, 2021.

[11] At the time this message was sent, I believe TODOROVA was physically in Mexico. As noted above, according to border crossing information, TODOROVA traveled to Mexico on December 23, 2020 and returned to Los Angeles on January 28, 2021, two days after sending this message. Accordingly, I believe that TODOROVA used the AT&T Telephone to advertise the sale of additional narcotics to R.M. (who had already died). TODOROVA again traveled to Mexico on February 14, 2021, and returned on March 4, 2021, as further described below.

drugs, which are similar to the terms used in the communications between TODOROVA's iCloud Account 1 and R.M.'s iCloud Account 2 on November 15, 2020. For example, the messages referred to "C," which means cocaine, and "blues," which means Oxycodone or OxyContin.[12]

D. **DEA Obtains Additional Devices and Ring Camera Footage Showing a White Honda, later identified as the SUBJECT VEHICLE, Arriving at R.M.'s Home Consistent with the iMessages Described Above**

42. On February 25, 2021, I accessed the iPhone S (ported with R.M.'s phone number as described above; no passcode) and visually confirmed the messages in the phone matched the messages received via email from K.M. as described above.

43. On February 25, 2021, TFO David Roeder and I took custody of two iPhones, including R.M.'s iPhone Xs described above, and two USB drives: one containing the aforementioned screenshots from R.M.'s iCloud from LAPD and another containing images/video from R.M.'s "Ring" camera.[13] As noted above, I accessed R.M.'s iPhone Xs using the passcode provided by R.M.'s family and visually confirmed the messages in the phone with the T-Mobile Telephone matched the screenshots contained in the USB

_____

[12] Based on my training and experience, I know that Oxycodone is often blue in color and has markings "M" on one side and "30" on the other side. As previously described above, DEA Drug Exhibits 1, 2, and 3 include blue in color pills (Ex. 1) and pills with those markings (Exs. 2 and 3). I also know that illegal drug traffickers and manufacturers are known to create copycat pills that resemble pharmaceutical Oxycodone and that these pills are often made with fentanyl. R.M. asked for "Oxy blues" in the texts before his death.

[13] As noted above and detailed further below, Ring camera footage from the night of November 15, 2020, shows a White Honda idling outside R.M.'s home that I believe belongs to SEI.

drive provided by the decedent's family. Also as noted above, I saw and confirmed TODOROVA's name, email address, and phone number for the T-Mobile Telephone saved in R.M.'s iPhone Xs under the "Mimi Snowie" contact linked to TODOROVA and her iCloud Account 1.

44.  Review of R.M.'s ring camera footage from November 15, 2020, shows a white Honda sedan with tinted windows, later identified as the SUBJECT VEHICLE belonging to SEI, arriving at R.M.'s home at approximately 10:25 p.m. consistent with the messages between TODOROVA's iCloud Account 1 and R.M.'s iCloud Account 2.[14] Shortly thereafter, R.M. exits his house at 10:32 p.m. and enters the White Honda for a short, but unknown period of time. Due to a gap in footage, R.M. is not seen exiting the car. However, it appears R.M. went back to his house for something and then re-entered the car at 10:38 p.m. and then returned to his home. Again, due to a gap in footage, R.M. is not seen exiting the car:

---

[14] As detailed below, I believe the White Honda in the Ring camera images is the SUBJECT VEHICLE belonging to SEI based on a combination of DMV records, LPR images from the area that night, court authorized-location data for SEI's phone linked to iCloud Account 3 and a cellphone later identified as "Digital Device 1" and believed to be used by SEI, and surveillance photographs.

| 10:30 p.m. | 10:32 p.m. | 10:38 p.m.[15] |
|---|---|---|



45.  Less than two hours later, about 12:01 a.m. on November 16, 2020, the White Honda returns consistent with the messages between TODOROVA's iCloud Account 1 and R.M.'s iCloud Account 2, but due to a gap in footage R.M. is not seen.

| 12:01 a.m. | 12:01 a.m. | 12:04 a.m. |
|---|---|---|



46.  As described below, based on a combination of DMV records, information from TODOROVA's cellphone, court-authorized historical cell site data from SEI's cellphone, and Beverly Hills license plate reader ("LPR") images, I believe the White Honda is the SUBJECT VEHICLE belonging to SEI. As detailed

---

[15] Victim R.M.'s face has been redacted in this image.

below, toll records show that a cellphone identified as "Digital Device 1" below, called R.M.'s phone linked to iCloud Account 2 at approximately 12:03 a.m. on November 16, 2020, which is consistent with the above Ring footage showing SEI's car arriving at approximately 12:01 a.m. and departing at approximately 12:04 a.m. Furthermore, court-authorized historical cell site data for Digital Device 1 and SEI's phone number linked to iCloud Account 3 place both phones near this area between approximately 12:02 a.m. and 12:06 a.m. Both phones hit off the same cell tower location during this time window. Specifically, Digital Device 1 was logged calling R.M. at 12:02:43 a.m.;[16] SEI's phone, via iCloud Account 3, was logged making contact with phone number ending in 8664 at 12:05:13 a.m. Both phones hit off the same cell tower location which is approximately 0.33 miles from R.M.'s residence.

### E.    Surveillance of TODOROVA

47.    Between March 5 and March 23, 2021, investigators and I engaged in stationary and mobile surveillance of TODOROVA, her apartment, and car. During this period of surveillance, investigators saw TODOROVA leaving her apartment and driving her car to various locations throughout Los Angeles County to conduct brief meetings with different individuals that appeared consistent with drug deliveries.

---

[16] The toll records for Digital Device 1 and R.M.'s phone linked to iCloud Account 2 differ slightly. Toll records for Digital Device 1 show one logged call to R.M.'s phone at approximately 12:02:43 a.m. Toll records for R.M.'s phone show three logged calls from Digital Device 1 at 12:03:08 a.m., 12:03:09 a.m., and 12:03:10 a.m.

48.  On March 10, 2021, at about 9:29 p.m., TFO Bedolla saw TODOROVA and an individual, later identified as Courier A, arriving on Carlos Ave in TODOROVA's car. TODOROVA and Courier A exited TODOROVA's car and entered a 2019 White Jeep Compass SUV with Florida license plate KNFF66.[17] After a couple of minutes, TODOROVA exited Courier A's vehicle and returned to her own vehicle and parked in the parking garage at her apartment complex. Courier A departed shortly thereafter and was stopped by LAPD and issued a warning for California Vehicle Code 26708(a)(1). Investigators and I briefly followed Courier A away from the traffic stop before terminating surveillance for the night. As described further below, on October 22, 2021, SA Howell and I interviewed Courier A, who confirmed that he met with TODOROVA on March 10, 2021, as observed during the surveillance, and that was effectively his orientation into TODOROVA's DTO. Also described further below, on November 15, 2021, IRS Fellows and I interviewed Courier A at the DEA HIDTA office.

**F.   Federal Agents Execute Federal Search Warrants and Find Controlled Substances and Digital Device 1 in TODOROVA's Apartment, as well as TODOROVA's AT&T Telephone Linked to iCloud Account 1 in Her Car**

49.  On March 19, 2021, the Honorable Alexander F. MacKinnon, United States Magistrate Judge for the United States District Court for the Central District of California, signed search warrants for TODOROVA's person, apartment, and car in

_____

[17] Courier A still operates this vehicle, but now with California license plate 8UCD382. The vehicle is not registered in Courier A's name, but is registered at his address. I believe the name on the registration is Courier A's mother.

Case Numbers 2:21-MJ-01349, 2:21-MJ-01351, and 2:21-MJ-01352, respectively.

50. On March 24, 2021, at approximately 3:45 p.m., federal agents and I began executing these warrants. Utilizing a marked LAPD patrol vehicle, TODOROVA was stopped at a Mobil gas station just north of Eastown Apartment Complex, located at 6228 Franklin Ave, Los Angeles, 90028. SA Dansart and I approached TODOROVA when LAPD Officers Kuipers (Serial # 42896) and Riggen (Serial # 40698) had detained her in handcuffs outside of TODOROVA'S Car for the safety of all involved. SA Dansart and I explained that federal search warrants were being executed for TODOROVA, TODOROVA'S Car, and TODOROVA'S Apartment.

a. Inside TODOROVA'S Car, investigators found TODOROVA's AT&T Telephone, which is linked to iCloud Account 1, on the center console with a mapping application open that appeared to be displaying a course to the Bank of America that investigators had previously observed TODOROVA visiting. Investigators placed the phone in "Airplane" mode, turned off the Wifi connection, plugged in the power cable, and left the phone on and running. TODOROVA's Car was later searched at approximately 9:30 p.m. and remained impounded with LAPD until being returned to her family at a later date when a determination was made to not seize the vehicle for asset forfeiture per the AUSA. On TODOROVA'S person, we found no items or evidence to be seized. SA Dansart and I asked TODOROVA which key opened TODOROVA's Apartment and she indicated the correct

key, which I used to unlock the door to enter TODOROVA'S APARMENT during the service of the federal search warrant.

51.  At approximately 4:30 p.m., federal agents and I knocked and announced our presence and with no response heard from inside, I used the key to unlock the door to TODOROVA'S Apartment. No one was inside TODOROVA's Apartment. Federal agents and I saw numerous suspected illegal drugs in various stages of packaging in multiple locations within TODOROVA'S Apartment, including in plain view in the hallways, kitchen counter, and stovetop. Due to the presence of white powder, LAPD Clandestine Laboratory Team responded to the scene at about 6:00 p.m. and prepared to enter the apartment and check for the presence of fentanyl. When determined safe to enter to conduct a proper search, investigators then began searching TODOROVA'S Apartment and collecting evidence.

52.  In TODOROVA'S Apartment, we found and seized about 52 DEA drug exhibits, in addition to a number of DEA non-drug exhibits. The search of TODOROVA'S Apartment concluded at approximately 10:00 p.m. and it was left locked and secured. The 52 DEA drug exhibits found inside TODOROVA's Apartment include, but are not limited to, the following:

    a.  One brick shaped package and multiple other exhibits that the DEA Southwest Laboratory later determined to collectively contain approximately 944.024 grams of cocaine;

    b.  Pills that the DEA Southwest Laboratory later determined to contain approximately 96.444 grams of MDMA;

  c. Substances that the DEA Southwest Laboratory later determined to contain approximately 89.8 grams of ketamine;

  d. At least nine plastic bags filled with multiple pills and capsules of varying size, color, and shape suspected to be illegal drugs, including one light blue pill[18] stamped with marking "M" on one side and "30" on the other, which the DEA Southwest Laboratory later determined to contain fentanyl;

  e. Substances believed to be psilocybin mushrooms; and

  f. Substances believed to be and labeled as lidocaine.

 53. The DEA non-drug exhibits found inside TODOROVA's Apartment include, but are not limited to, the following:

  a. Packaging materials consistent with drug trafficking;

  b. Plastic baggies consistent with drug trafficking;

  c. Empty pill capsules consistent with drug trafficking;

---

[18] This pill, Exhibit 56, was originally described as a white pill stamped with marking "M" on one side and "30" on the other. When the DEA Southwest Laboratory chemist opened the evidence bag to process and test the pill, she determined the pill to be light blue, not white, and noted that fact to me via email on April 16, 2021. Based on my training and experience, I know that Oxycodone is often blue in color and has markings "M" on one side and "30" on the other side. As previously described above, DEA Drug Exhibits 1, 2, and 3 include blue in color pills (Ex. 1) and pills with those markings (Exs. 2 and 3). I also know that illegal drug traffickers and manufacturers are known to create copycat pills that resemble pharmaceutical Oxycodone and that these pills are often made with fentanyl. R.M. asked for "Oxy blues" in the texts before his death.

      d.    A small digital scale near numerous confirmed drugs;

      e.    Bulgarian passport with number 384325327;

      f.    Canadian passport[19] with number GF970922;

      g.    United State passport with number 496995601;

      h.    A gold colored Apple iPhone cellular telephone with a clear case identified on the back as "Model A1661" ("Digital Device 1"), found near suspected illegal drugs in the apartment hallway, near the front door;[20]

      i.    A white Apple iPhone cellular telephone with a cracked/damaged screen identified on the back as "Model A1456" ("Digital Device 2") found in top left drawer of a bedroom dresser with pills found in nearby dresser drawer to the right; and

      j.    A silver HP laptop computer with Serial Number GSC1014071 ("Digital Device 3"), found in a bedroom closet near lidocaine.

54. At approximately 6:55 p.m., SA Dansart and I advised TODOROVA of her Miranda Rights at the Hollywood LAPD Station, located at 1358 North Wilcox Ave, Los Angeles, CA 90028. TODOROVA signed a DEA-13 Advisement of Rights Form and affirmed

---

[19] On the Canadian passport, her name is spelled "Mariela Dimitrova Todorova."

[20] As noted above and detailed below, I later determined that Digital Device 1 corresponds to phone number 323-472-7924, which called R.M. three times in succession at approximately 12:03 a.m. on November 16, 2020, according to R.M.'s tolls and is consistent with arrival of the White Honda seen on Ring camera footage. See footnote 16 above for further information regarding the phone tolls.

that she understood her rights as they were read to her and as
she read herself. SA Dansart and I signed as witnesses. TODOROVA
invoked her right to an attorney.

> **G.  TODOROVA's AT&T Telephone Linked to iCloud Account 1
> Contains Numerous iMessages with R.M.'s iCloud Account
> 2 and Other "Driver" Contacts about Drug Sales**

55.  At approximately 11:00 p.m. that same day, I began an
initial review of TODOROVA's AT&T Telephone, which showed that
TODOROVA used the AT&T Telephone, its number 323-688-9519 (which
was previously carried by T-Mobile prior to December 12, 2020),
and associated iCloud Account 1 (which was also associated with
the phone number while carried by T-Mobile) to conduct and
coordinate illegal drug transactions over the last few years.
During my review, I identified numerous iMessages between
TODOROVA's iCloud Account 1 and R.M.'s iCloud Account 2, along
with many other drug customers. I also learned that TODOROVA
used a network of at least 19 possible drivers, which were saved
in her phone as contacts with the word "Driver," to aid in
completing drug sales. More specifically, my review of
TODOROVA's AT&T Telephone showed the following:

a.  TODOROVA has a contact saved as "R-- Client Rich
Kid" with a phone number that matches the phone number for
decedent R.M.'s iCloud Account 2. TODOROVA's AT&T Telephone
still had the iMessages between TODOROVA and R.M. coordinating
the sale of drugs on November 15, 2020, the night before R.M.'s
death. I also saw messages after R.M.'s death described above in
which TODOROVA advertised the sale of additional drugs to R.M.
in December 2020 and January 2021. Additionally, the

conversation history dates back to November 8, 2018, at approximately 7:59 p.m., where decedent R.M. texted TODOROVA and informed her of R.M.'s new phone number and that R.M. lived in Los Angeles. This conversation history documents numerous illegal drug transactions over the last few years and shows that TODOROVA and R.M. have known each other for a few years.

      b.    TODOROVA's AT&T Telephone has at least nineteen contacts saved with the word "Driver" included as part of the contact information. For example, a March 21, 2021 message to a contact listed as "Don Driver," details names, hourly schedules, and hourly/daily/nightly salaries for drivers to deliver for her. Based on my initial review of her messages and my training and experience, I believe TODOROVA used a network of delivery drivers, under her control and authority, to coordinate the distribution illegal drugs.

      c.    In particular, one of the "Driver" contacts in TODOROVA's AT&T Telephone was saved as "Kather Driver," later identified as SEI. Also, a section in the iPhone "Notes" application listed an email address of "Kathersei@yahoo.com" followed by "7/29/20 is the PayPal." I later obtained records from Apple which show that the email address kathersei@yahoo.com is associated with the DSID 1075216694 (iCloud Account 3). I have learned through my training and experience that a DSID is a unique ID generated when registering at iCloud.com and assigned to the user. According to the records from Apple, both the email address and DSID are associated with "mucktarr Sei" with an address listed of "333 South Saint Andrews Place #222, Los

Angeles, CA 90020-4368" (identified above as the SUBJECT PREMISES) and telephone number "732-763-1328" (SEI's phone number linked to iCloud Account 3). The name "Kather Sei" is also linked to the email address, DSID, and telephone number. It is linked to the SUBJECT PREMISES, too, but the formatting is slightly different and excludes the apartment number. Further investigation has shown that SEI is a professional actor who goes by "Kather Sei" as verified on multiple open source pages including Internet Movie Database ("IMDb"), Facebook, and Amazon Prime Video. IMDb provides photos of SEI and cites various films and television shows he has appeared in over the years.[21] Amazon Prime Video does the same. As of November 30, 2021, SEI's Facebook page also identifies his profile name as "Kather Sei (Muck)."[22] I compared the DMV Image Record for SEI to photos on the open source pages above and confirmed it is the same person:

| DMV | IMDb | Facebook |
|---|---|---|
|  |  |  |

---

[21] Per IMDB, SEI's recent credits show roles on Fox's television series *Lucifer*, where he appeared as "Guy" in 2019, and on CBS's television series *S.W.A.T.*, where he appeared as "Officer Pitts" in 2018.

[22] A previous review of the Facebook page showed a display of "(Mucktarr)" rather than "(Muck)" as it can be seen currently.

      d.   Phone toll record analysis from November 3, 2020 to March 7, 2021, showed approximately 365 contacts between the phone numbers associated with TODOROVA's iCloud Account 1 and SEI's iCloud Account 3. Further toll analysis shows that SEI has been in contact with numerous phone numbers that TODOROVA had also been in contact with over several months. Toll analysis shows contact with some of these numbers before and after TODOROVA's arrest on March 24, 2021.

      e.   Another "driver" identified in TODOROVA's cellphone was Courier A, whom investigators identified on March 10, 2021, while surveilling TODOROVA. As noted above and described more fully below, on October 22, 2021, SA Howell and I interviewed Courier A, who confirmed that Courier A met with TODOROVA on March 10, 2021, as observed during the surveillance, and that was effectively Courier A's orientation into TODOROVA's DTO. Additionally, as noted above and described more fully below, on November 15, 2021, IRS Fellows and I interviewed Courier A at the DEA HIDTA office.

      f.   TODOROVA's AT&T Telephone has numerous phone calls and text message conversations with clients and drivers regarding the sale of illegal drugs. TODOROVA's AT&T Telephone has a very high number of individual threads in the iMessage application. There are numerous examples of illegal drug listings being sent from the phone to various numbers and saved contacts that describe types of drugs, pricing, availability of

delivery, etc. that are consistent with the messages received by R.M. as described further above.

g.    Several messages show TODOROVA inviting customers to come pick up their orders, including one iMessage thread from March 23, 2021, in which TODOROVA directs the customer to come pick up the agreed upon order from her on Carlos Ave, adjacent to the Eastown Apartment Complex that contains TODOROVA's Apartment, indicating that she likely kept illegal drugs inside her Apartment as discovered by execution of the federal search warrants described above.

h.    TODOROVA's network of drivers used other unidentified vehicles to distribute and deliver illegal drugs and conduct illegal drug transactions. Messages to customers show TODOROVA telling customers what cars will be arriving with their orders.

i.    TODOROVA used other messaging applications on TODOROVA's AT&T Telephone, including Signal, WhatsApp, Telegram, and Discord. Based on my training and experience and conversations with other experienced law enforcement officers, I know that drug traffickers often use apps such as these due to encryption capabilities.

j.    TODOROVA's AT&T Telephone has multiple financial exchange applications, including Venmo, Zelle, Paypal, Cash App; and banking applications, including Capital One and Bank of America banking. Numerous messages indicate that TODOROVA received payments from customers using financial exchange applications such as these.

**H.  TODOROVA is Indicted by a Federal Grand Jury**

56.  On May 18, 2021, TODOROVA was charged in an indictment with possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii), possession with intent to distribute MDMA, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and criminal forfeiture, in violation of 21 U.S.C. § 853, all arising out of the execution of the above-mentioned search warrant on her apartment.

**I.  Further Identification of SEI's iCloud Account 3, Involvement in the DTO, Participation in the Fatal Distribution to R.M., the SUBJECT VEHICLE, and the SUBJECT PREMISES**

57.  After execution of the above-described search warrants on March 24, 2021, I continued my investigation and further identified SEI's connection to iCloud Account 3, his involvement in the DTO, and participation in the fatal distribution to R.M. as summarized below.

1.  SEI's connection to iCloud Account 3 and the SUBJECT PREMISES

58.  As noted above, SEI's phone number associated with his iCloud Account 3 was saved in TODOROVA's AT&T Telephone as a contact named "Kather Driver," and a section in the iPhone "Notes" application listed an email address of "Kathersei@yahoo.com" followed by "7/29/20 is the PayPal." SEI goes by "Kather Sei" in his professional work as an actor. I also obtained records from Apple which show SEI's connection to iCloud Account 3.

59.  Subscriber information from T-Mobile for SEI's phone number linked to iCloud Account 3 lists SEI as the subscriber

and his address as the SUBJECT PREMISES, which also matches the toll analysis reports conducted by IRS Fellows.

60. According to law enforcement database records, SEI has been associated with the SUBJECT PREMISES since approximately October 2017. Furthermore, CA DMV records list the SUBJECT PREMISES as SEI's address with a date of May 14, 2018. This is also the date of his driver's license application and DMV photo according to CA DMV records.

### 2. Toll and financial records confirm TODOROVA's connection to SEI via their respective iCloud Accounts 1 and 3

61. Toll records show that SEI's phone number linked to iCloud Account 3 was one of TODOROVA's most frequent contacts on her phone number linked to iCloud Account 1. Between November 3, 2020, and March 7, 2021, there were 365 contacts between TODOROVA and SEI. TODOROVA's toll records also show contact with SEI on November 11, 23, and 27, 2020. During the investigation, I learned from IRS Fellows that TODOROVA left for Mexico on November 11, was still in Mexico on November 23, and returned to Los Angeles on November 27, 2020. Additionally, toll records show at least 40 common contacts between SEI and TODOROVA. Furthermore, before and after TODOROVA's arrest on March 24, 2021, SEI has been in contact with numbers, that TODOROVA had also been in contact with previously.

62. Financial records connect both TODOROVA and SEI to several Peer to Peer ("P2P") services such as PayPal, CashApp/Square, Venmo, Early Warning/Zelle, and Apple Pay. Records show that TODOROVA's and SEI's respective P2P accounts

are linked to their respective iCloud Accounts 1 and 3 with at least some of the same shared identifiers.

63. For example, TODOROVA's iCloud Account 1 shares phone, name, and address information with regards to her PayPal.[23] And SEI's iCloud Account 3 shares name, phone, email, and address information with regards to his Venmo account (10992201) name "ACoolKat." This is not an exhaustive list of shared links between iCloud Accounts 1 and 3 and the P2P accounts.

64. iCloud Accounts 1 and 3 are also linked directly to each other via transactions on the P2P application CashApp/Square. With regards to CashApp/Square, SEI sent approximately $9,075.00 to TODOROVA and TODOROVA sent SEI approximately $1,035.00.

65. Numerous transactions for both TODOROVA and SEI are consistent with suspected drug trafficking activities. Such transactions share similar prices, transaction memos, customers, and identified co-conspirator contacts in the P2P records.

    a. PayPal: The average payment amount for transfers received by TODOROVA via PayPal was $255.97.[24] This amount is compatible with the pricing for controlled substances and illicit drug orders that TODOROVA sent to R.M. on November 15,

---

[23] Subpoena information showed that TODOROVA had one closed PayPal account (1523059787761633462) and one open PayPal account (2211860193213150399). The closed account was created on November 18, 2016. The open account was created on November 3, 2020. The open account included her known address of 6201 Hollywood Blvd Apt 2406, Los Angeles, CA 90028.

[24] Both known TODOROVA PayPal accounts shared the following identifiers: Name – Mirela Todorova; CC Statement Name – 123MIMI; Email – 123mimi@gmail.com; Phone Number – 323-688-9519.

2020. The average payment amount for transfers received by SEI via PayPal was $119.73.[25] TODOROVA and SEI had numerous PayPal P2P transactions connected to three of the same contacts, one of whom I believe is identified as a "Driver" in TODOROVA's AT&T cellphone.

  b. Venmo: The average payment amount for transfers received by TODOROVA via Venmo was $245.39.[26] This amount is compatible with the pricing for controlled substances and illicit drug orders that TODOROVA sent to R.M. on November 15, 2020. This average payment amount is also similar to payments received to TODOROVA's PayPal and CashApp accounts. TODOROVA used Venmo username "clubmimi." As noted above and detailed below, the phone identifier for this account is 323-472-7924, which is the number for Digital Device 1. Per toll records, Digital Device 1 called R.M.'s phone linked to iCloud Account 2 at approximately 12:03 a.m. on November 16, 2020, which is consistent with the above Ring footage showing the SUBJECT VEHICLE arriving at approximately 12:01 a.m. and departing at

---

[25] SEI's PayPal account (1962752688331058098) has the following identifiers: Name – mucktarr Sei; CC Statement Name – KATHERSEI; Email – kathersei@yahoo.com; Phone Number – 732-763-1328. The account was opened on July 10, 2010, and it includes his known address at the SUBJECT PREMISES.

[26] TODOROVA previously had a Venmo account (2862471) that was blacklisted. I did not receive any transactional data from that account. It was associated with her known email of 123mimi@gmail.com. The account was created on November 18, 2014. Her above analyzed Venmo account (92980782) is also now blacklisted and had the following identifiers: Name – Mirela Todorova; DOB – 03-19-1988; SSN – 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; Phone Number – 323-472-7924 (Same as Digital Device 1); Email – todorovamirela@yahoo.com. The account was created on November 4, 2020.

approximately 12:04 a.m. The average payment amount for
transfers received by SEI via Venmo was $184.00.[27] SEI used Venmo
username "ACoolKat." TODOROVA and SEI were connected to at least
six of the same contacts on Venmo. One suspected customer lists
the majority of transaction memos with TODOROVA and SEI as "dog
walking" or "dog walk(s)." This customer also has phone tolls
with SEI's phone number linked to iCloud Account 3.

        c.    CashApp/Square: The average payment amount for
transfers received by TODOROVA via CashApp/Square was $227.16.[28]
This amount is compatible with the pricing for controlled
substances and illicit drug orders that TODOROVA sent to R.M. on
November 15, 2020. TODOROVA used the "Cashtag" (username)
"clubmimi[29]." The average payment amount for transfers received
by SEI via CashApp/Square was $187.32.[30] SEI used the "Cashtag"
(username) "acoolkat." TODOROVA and SEI were connected to five
of the same contacts on CashApp/Square. One is the same customer
as referenced above with the "dog walking" transaction memos.

---

[27] SEI's Venmo account (10992201) has the following
identifiers: Name – Kat S; DOB – 07-24-1985; SSN – 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;
Phone Number – 732-763-1328; Email – kathersei@yahoo.com. The
account was opened on May 24, 2016, and it includes his known
address at the SUBJECT PREMISES.

[28] TODOROVA's CashApp/Square account has the following
identifiers: DOB – 03/19/1988; Last Four of SSN – 4577; Phone
Number – 323-688-9519; Email – 123mimi@gmail.com.

[29] In a November 15, 2021 interview with Courier A, this
specific username was mentioned. Courier A noted that this
username was one of several listed for payment options.

[30] SEI's CashApp/Square account has the following
identifiers: Name – Mucktarr Sei; DOB – 07-24-1985; Last Four of
SSN – 4839; Phone Number – 732-763-1328; address at the SUBJECT
PREMISES. It listed previous display names of "Mucktarr Sei",
"Kather", "Kat", "Kat Cool", and "Cool Kat."

d.   Zelle: The average payment amount for transfers received by TODOROVA via Early Warning/Zelle was $250.93.[31] This amount is compatible with the pricing for controlled substances and illicit drug orders that TODOROVA sent to R.M. on November 15, 2020. The average payment amount for transfers received by SEI via Early Warning/Zelle was $291.00.[32] Records obtained by investigators do not show TODOROVA and SEI being connected to any mutual contacts on Early Warning/Zelle.

e.   Apple Pay: The average payment amount for transfers received by TODOROVA via Apple Pay was $232.50.[33] This amount is compatible with the pricing for controlled substances and illicit drug orders that TODOROVA sent to R.M. on November 15, 2020. The average payment amount for transfers received by SEI via Apple Pay was $123.42[34]. Records obtain by investigators

---

[31] TODOROVA's Early Warning/Zelle account information has the following identifiers for the profiles listed as "ACTIVE": Name – Mirela Todorova; Bank Name – Bank of America; Phone Number – 323-688-9519. The "INACTIVE" profiles showed her known email address of 123mimi@gmail.com, previous banks Chase and Wells Fargo, and her known phone number of 323-688-9519 as well as the number 805-299-5213.

[32] SEI's Early Warning/Zelle account information has the following identifiers for the profiles listed as "ACTIVE": Name – Mucktarr Sei; Bank Name – Wells Fargo; Phone Number – 732-763-1328, Email – kathersei@yahoo.com.

[33] TODOROVA's Apple Pay account information has the following identifiers: Acct Name – Mirela Todorova; DOBMonthYear – 3/1988; Last4SSN – 4577; Address – 3932 Rodene St; Zip - 91320

[34] SEI's Apple Pay account information has the following identifiers: Acct Name – Kather Sei; DOBMonthYear – 7/1/1985; Last4SSN – 4839; Address – 333 S St Andrews Pl #233; Zip – 90020. SEI also has a Greendot Card linked to his Apple Pay account with the following identifiers: Cardholder – mucktarr sei; Cell Phone – 7327631328; DOB – 7/24/1985; SSN – 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; Email – mucktarr@yahoo.com; Address (Mailing & Residential) – 333 S St Andrews Pl Apt. 222, Los Angeles, CA 90020.

show TODOROVA and SEI having two mutual contacts on Apple Pay.
These two mutual contacts have also appeared in other P2P data
for both TODOROVA and SEI.

66.    In summation of the above regarding financial
transactions, both TODOROVA and SEI moved substantial amounts of
money over the known time period for the records. TODOROVA
specifically received approximately $733,357.19 combined via the
for five P2P services listed in the above subparagraphs. This
took place over the course of about a year and is not exhaustive
as data range dates vary. SEI specifically received
approximately $31,628.52 combined via the five P2P services
listed in the above subparagraphs. This took place over the
course of several months, but less than a year and is not
exhaustive as the data range dates vary.

           3.   <u>Identification of SEI's SUBJECT VEHICLE and
connection to the fatal distribution to R.M.</u>

67.    The DMV Image Record for SEI lists the SUBJECT
PREMISES as the address on file, matching SEI's T-Mobile
subscriber information. Furthermore, the SUBJECT VEHICLE
registered to SEI per DMV records is a 2015 white Honda Civic
sedan, bearing California license plate number 7JWT414, and it
is registered at the SUBJECT PREMISES.

68.    On March 18, 2021, TFO Alex Pozo received a document
containing LPR images from Beverly Hills Police Department
showing the drive path of a white four door sedan, later
identified as the SUBJECT VEHICLE belonging to SEI, during the
known time frame of the first delivery to R.M. on the night of

November 15, 2020. On March 20, 2021, TFO Pozo received the footage from the LPR cameras that captured this same vehicle and allowed for the compilation of the images that showed the drive path.

69.  On April 28, 2021, TFO David Holmes took a photograph of the SUBJECT VEHICLE in the parking garage of the SUBJECT PREMISES. I viewed the photograph and confirmed the license plate number 7JWT414 was correct:



70.  Later on this same date, I compared the above photo of the SUBJECT VEHICLE with R.M.'s Ring camera footage and Beverly Hills LPR images of a White Honda sedan with tinted windows from the night of November 15, 2020, and I believe the White Honda on R.M.'s Ring camera footage is the SUBJECT VEHICLE. As noted above, Ring camera footage from November 15, 2020, shows the White Honda arriving at R.M.'s house at approximately 10:25 p.m., which is consistent with the messages between TODOROVA's and R.M.'s iCloud Accounts 1 and 2, respectively. Furthermore, the footage shows the White Honda returning to R.M.'s house at about 12:01 a.m. on November 16, 2020, which is also consistent messages discussed above.

71.  After reviewing Beverly Hills LPR images from the night of November 15, 2020, and early morning of November 16, 2020, I identified the White Honda driving in a direction toward and away from R.M.'s home consistent with the messages. Further, an LPR image taken at about 10:25 p.m. on November 15, 2021, at the intersection of North Beverly Drive and Sutton Way shows a partial license plate, as seen below. While grainy, the image shows what I believe are the characters "WT414" on the plate, which are the last 5 characters on the license plate of the SUBJECT VEHICLE, 7JWT414:



72.  Furthermore, the White Honda in the LPR images and Ring camera footage is clearly a white Honda sedan, and I believe it is a Civic model based on its body shape. The White Honda in the LPR images also has tinted windows on the side and

rear just like the car on the Ring camera footage.[35] Therefore, I believe the White Honda is the SUBJECT VEHICLE belonging to SEI. At the time of this image, the SUBJECT VEHICLE was headed in the direction of R.M.'s home, which is about 0.2 miles away from R.M.'s home per Google Maps. For ease of reference:

| November 15, 2020, 10:25 p.m. | November 15, 2020, 10:30 p.m. |
|---|---|
|  |  |

73. Using LPR image technology, I was able to determine the likely drive path of the SUBJECT VEHICLE before arriving at R.M.'s home. Starting at about 10:19 p.m., in the vicinity of the intersection of Beverly Boulevard and North Maple Drive in Beverly Hills, an LPR image from that intersection shows the SUBJECT VEHICLE. The SUBJECT VEHICLE went west and then turned north on North Crescent Drive at about 10:20 p.m. At about 10:22 p.m., the SUBJECT VEHICLE passed through the Sunset Boulevard

---

[35] At the time, TODOROVA had a 2020 white Honda, but it was an Accord, which is larger and has a different body shape than the car depicted in the November 15 and 16, 2020 Ring camera footage. TODOROVA's car also did not have tinted windows. Furthermore, TODOROVA's license plate for her car is 8PIJ378, which does not appear to match the LPR images.

and North Crescent Drive intersection and turned onto Lexington Road heading east briefly before turning onto North Beverly Drive and continuing north leading up to the LPR image shown above at the intersection of North Beverly Drive and Sutton Way at 10:25 p.m., which is 0.2 miles from R.M.'s home.

74. Most notably, there is a gap in the LPR images from between about 10:25 p.m. and 10:40 p.m., which is consistent with the Ring camera footage showing the SUBJECT VEHICLE at R.M.'s house during that time period. The first Ring camera footage activation featuring the SUBJECT VEHICLE began about 10:25 p.m., which shows the car arriving and sitting for a few minutes as depicted in the 10:30 p.m. screen shot above. The last Ring camera footage activation featuring the SUBJECT VEHICLE during that time period began at about 10:38 p.m.

75. The next available LPR image is at 10:40 p.m. at the intersection of North Beverly Drive and Sutton Way, this time with the car traveling in the opposite direction when compared to the 10:25 p.m. LPR image at this location. After leaving R.M.'s house, the SUBJECT VEHICLE traveled south towards Beverly Hills again with the last LPR image captured at approximately 10:47 p.m. in the vicinity of Burton Way and Foothill Road, just over two miles from R.M.'s house. This time period for the drive path is consistent with both the iMessages between TODOROVA's iCloud Account 1 and R.M.'s iCloud Account 2 as well as the Ring camera footage outside of R.M.'s house.

 4. Connecting SEI's cellphone linked to iCloud
Account 3 and Digital Device 1 Seized from
TODOROVA's Apartment to the Fatal Distribution
and the SUBJECT PREMISES

76. As noted above, R.M.'s toll records show that on November 16, 2020, at approximately 12:03 a.m., telephone number 323-472-7924, later identified as linked to Digital Device 1, called R.M. three times in short succession.[36] As mentioned above, TODOROVA's iCloud Account 1 texted R.M. when the courier arrived just after midnight on November 16, 2020, and Ring video footage shows the SUBJECT VEHICLE returning to R.M.'s home also at about 12:01 a.m. before the three calls. Ring footage further shows the SUBJECT VEHICLE departing R.M.'s home at about 12:04 a.m., shortly after those three calls as well.

77. On April 29, 2021, I called 323-472-7924 and my call went straight to voicemail for a Lycamobile voicemail system.[37] I previously observed that Digital Device 1 described above operated with Lycamobile as the carrier. I turned on Digital Device 1 and called 323-472-7924 again. This time, Digital Device 1 immediately rang in my hand. Thus, I believe that Digital Device 1 operates using the number 323-472-7924.

78. Notably, TODOROVA's toll records show contact with Digital Device 1, including an incident on November 27, 2020, where TODOROVA placed a call to 323-472-7924 at approximately 11:38 a.m. and then seconds later placed a call to SEI, as if to

---

[36] Refer to footnote 16 for a more detailed explanation of the tolls.

[37] According to the company website, Lycamobile is a large, international mobile virtual network operator that provides services in 23 countries, including the United States.

try to reach someone on a secondary number when there is no response to the first number. Both calls appeared to have no response. SEI then called TODOROVA at approximately 11:45 a.m. and the call appeared to have been answered with approximately one minute and twenty-one seconds of elapsed time.

79. Furthermore, court-authorized cell site data links SEI's phone and Digital Device 1 to the fatal distribution and to the SUBJECT PREMISES. On May 20, 2021, the Honorable Margo A. Rocconi, United States Magistrate Judge for the United States District Court for the Central District of California, signed search warrants for historical cell-site location data for SEI's phone (linked to iCloud Account 3), Digital Device 1, and R.M.'s phone (linked to iCloud Account 2), in Case Number 2:21-MJ-02499, and for prospective cell-site location data and use of a cell-site simulator for SEI's phone (linked to iCloud Account 3), in Case Number 2:21-MJ-02500.

80. Historical cell-site location data for SEI's phone (linked to iCloud Account 3) shows him pinging near TODOROVA's apartment at approximately 2:09 a.m. on November 11, 2020, while placing a phone call to TODOROVA. This is the same day that TODOROVA departed for Mexico. The next three historical cell cite location data entries show SEI pinging near the SUBJECT PREMISES at approximately 8:13 a.m., 12:27 p.m., and 12:28 p.m. Later this same day, SEI was pinging near TODOROVA's Apartment during several calls at approximately 4:01 p.m., 4:02 p.m., and 4:03 p.m. Just before the end of this same day, at approximately 11:23 p.m., SEI again pinged near TODOROVA's Apartment while

48

receiving a call from 323-472-7924, identified later below as Digital Device 1 that was seized from TODOROVA's Apartment.

81.   During the next few days leading up to the fatal distribution to R.M. and on the night/day of R.M.'s death on November 16, 2020, while TODOROVA was in Mexico, SEI pinged near TODOROVA's apartment approximately 9 times. Notably, Digital Device 1 pinged near the SUBJECT PREMISES at approximately 8:36 a.m. and 8:37 a.m. on November 15, 2020. SEI's phone linked to iCloud Account 3 shows numerous pings near the SUBJECT PREMISES this same day at approximately 12:52 p.m., 2:41 p.m., 2:42 p.m., 2:44 p.m., 2:45 p.m., and 5:58 p.m.

82.   During or around the time of the drug distribution to R.M., historical cell-site data showed both SEI's phone and Digital Device 1 near R.M.'s house with hits off the same cell tower location on November 16, 2020, between 12:02 a.m. and 12:06 a.m.[38] This cell tower is approximately 0.33 miles from R.M.'s residence. This time period corresponds with the iMessages from TODOROVA's iCloud Account 1 to R.M.'s iCloud Account 2 regarding arrival of the SUBJECT VEHICLE, the Ring camera footage, and the tolls showing the calls from Digital Device 1 during this time period.

83.   After the drug distribution to R.M., SEI's phone linked to iCloud Account 3 pinged 3 times near TODOROVA's Apartment on November 16, 2020, at approximately 12:21 a.m., 12:24 a.m., and 12:58 a.m., before returning to and pinging near

---

[38] Refer to footnote 16 for a more detailed explanation of the tolls.

the SUBJECT PREMISES at approximately 1:47 a.m. Data shows SEI's phone pinging near the SUBJECT PREMISES from this time until approximately 6:13 p.m. later that day. Digital Device 1 pinged near TODOROVA's Apartment at approximately 11:24 p.m. on November 16, 2020. Digital Device 1 then pinged near the SUBJECT PREMISES at approximately 8:24 a.m. on November 17, 2020, where it remained and had numerous pings leading up to approximately 4:08 p.m. SEI's phone pinged numerous times near the SUBJECT PREMISES on November 17, 2020, with a period beginning at approximately 7:38 a.m. and continuing to approximately 11:52 a.m. This time period overlaps with Digital Device 1 and I believe that Digital Device 1 and SEI's phone linked to iCloud Account 3 were both within the SUBJECT PREMISES at times.

84.  In total, for the historical cell-site location data received for the period of approximately 6:18 p.m. on November 2, 2020, through approximately 12:24 p.m. on May 20, 2021, SEI's phone pinged near TODOROVA's Apartment approximately 368 times. For this same period, SEI's phone pinged near the SUBJECT PREMISES approximately 2564 times.

85.  In total, for the historical cell-site location data received for the period of approximately 8:33 p.m. on November 2, 2020, through approximately 1:32 p.m. on April 29, 2021, Digital Device 1 pinged near TODOROVA's Apartment approximately

70 times.[39] For this same period, Digital Device 1 pinged near the SUBJECT PREMISES approximately 48 times.

     5.   Surveillance of SEI, the SUBJECT VEHICLE, and the SUBJECT PREMISES

86. Between May 27, 2021, and the present, fellow investigators and I engaged in stationary and mobile surveillance of SEI, the SUBJECT VEHICLE, and the SUBJECT PRESMISES, at times with the aid of the court-authorized prospective cell-site data. In addition to targeted surveillance operations, fellow investigators and I have conducted numerous spot checks at the SUBJECT PREMISES and observed SEI, the SUBJECT VEHICLE, and SEI's apparent significant other, P.A.

87. On June 1, 2021, at approximately 2:39 p.m., SA Howell saw the SUBJECT VEHICLE parked on S Hobart Blvd facing south towards Wilshire Blvd. The SUBJECT VEHICLE was parked outside of the Avana on Wilshire Apartments, which has a listed address of 635 S Hobart Blvd, Los Angeles, CA 90005.

    a.   At approximately 2:51 p.m., SA Hodgson saw the SUBJECT VEHICLE's headlights turn on and SA Howell observed what appeared to be a female passenger. SEI's car then traveled south on S Hobart Blvd and turned west on Wilshire Blvd before parking next to a store front below the Avana on Wilshire Apartments. Due to traffic, it was difficult to see when the female passenger exited the vehicle. Neither SA Hodgson or SA Howell saw her exiting the SUBJECT VEHICLE, but both SA Hodgson and SA

---

[39] After Digital Device 1 was seized on March 24, 2021, the phone pinged twice near the DEA HIDTA office. These pings were in response to the phone being powered on while I attempted to unlock the phone and later when I called the phone.

Howell saw that SEI was the lone occupant when the SUBJECT VEHICLE left and continued westward on Wilshire Blvd. SA Hodgson and SA Howell then saw SEI turning northbound on S St Andrews Pl after leaving this location.

   b.   At approximately 3:02 p.m., SA Hodgson and SA Howell saw SEI pulling into the parking garage at the SUBJECT PREMISES and parking the SUBJECT VEHICLE.

   c.   At approximately 3:12 p.m., SA Hodgson received GPS location information for SEI's phone indicating it was at the location consistent with the SUBJECT PREMISES.

   88.   On June 29, 2021, at approximately 3:39 p.m., LAPD Detective Pedro Rodriguez saw SEI exiting the parking garage at the SUBJECT PREMISES in the SUBJECT VEHICLE and fellow investigators and I followed SEI away from the location.

   a.   At approximately 3:55 p.m., TFO Alex Pozo and I saw the SUBJECT VEHICLE pull over to the curb to park at the northeast corner of the Cole Ave and Santa Monica Blvd intersection. Briefly after parking, SEI exited the SUBJECT VEHICLE but investigators were unable to see where he went due to heavy vehicle traffic.

   b.   At approximately 4:00 p.m., I confirmed that the SUBJECT VEHICLE was unoccupied and remained parked in the same location. I then received GPS location information for SEI's phone indicating that it was nearby. Based on information on SEI, phone toll records for SEI's phone, and the local businesses in the area, investigators determined SEI had likely entered an acting studio business.

c.    At approximately 4:32 p.m., LAPD Det. Rodriguez and I saw SEI crossing the Santa Monica Blvd and Cole Ave intersection and walking to the SUBJECT VEHICLE wearing a black hat, black shirt, and gray shorts. I saw that SEI appeared to be carrying some paperwork in his left hand. SEI got into the car and remained stationary for a few minutes. Det. Rodriguez saw that SEI had likely come from New Collective LA - Acting Studio, which is located at 6440 Santa Monica Blvd, Los Angeles, CA 90038. Phone toll records indicate that SEI's phone has been in contact with this business.

d.    At approximately 4:37 p.m., SEI performed a U-turn in the SUBJECT VEHICLE and traveled southbound on Cole Ave through the Santa Monica Blvd intersection. Investigators followed the SUBJECT VEHICLE away from this location and maintained surveillance of it.

e.    At approximately 4:55 p.m., Det. Rodriguez and I saw the SUBJECT VEHICLE pulling into the most southern parking garage gate at the SUBJECT PREMISES. I received information for SEI's phone indicating it was at the location consistent with the SUBJECT PREMISES.

89.   On September 10, 2021, at approximately 3:26 p.m., I saw an unknown female exiting the parking garage at the SUBJECT PREMISES in the SUBJECT VEHICLE as the sole occupant. SA Howell and I followed the SUBJECT VEHICLE away from this location and maintained surveillance of it.

a.    At approximately 3:31 p.m., the unknown female
parked the SUBJECT VEHICLE in a CVS parking lot located at 3751
Wilshire Blvd and the unknown female entered the store.

b.    At approximately 3:45 p.m., I saw the unknown
female exiting the store and entering the driver's seat of the
SUBJECT VEHICLE.

c.    At approximately 3:46 p.m., the SUBJECT VEHICLE's
reverse lights turned on and the unknown female drove it away
northbound from CVS. SA Howell and I maintained surveillance of
the SUBJECT VEHICLE as it traveled away from this location.

d.    At approximately 3:49 p.m., SA Howell saw the
SUBJECT VEHICLE turning northbound on S St Andrews Pl from 4th
St, heading towards the SUBJECT PREMISES.

e.    At approximately 3:52 p.m., I confirmed that the
SUBJECT VEHICLE was parked in the southern most parking garage
entrance at the SUBJECT PREMISES.

f.    Further investigative efforts identified the
female as P.A. According to current intelligence, P.A. has a New
Jersey driver's license, no known criminal history, and works as
a dancer. She has also been involved in films that SEI has been
involved in, according to IMDb. SEI is also from New Jersey.
Investigators believe P.A. is SEI's significant other.

90.    On September 23, 2021, at approximately 2:20 p.m., TFO
Olga Alvarado saw the SUBJECT VEHICLE turning south onto S St
Andrews Pl from 3rd St. The SUBJECT VEHICLE entered the southern
most garage entrance at the SUBJECT PREMISES and parked in its
normal spot, as seen previously on surveillance. TFO Alvarado

saw that a female driver matching the description of P.A. was
operating the SUBJECT VEHICLE alone.

      a.   At approximately 3:40 p.m., TFO Alvarado saw the
SUBJECT VEHICLE exiting the parking garage at the SUBJECT
PREMISES and traveling north on Western Ave. SEI was driving and
P.A. was the passenger. Investigators followed the vehicle away
from this location and maintained surveillance of it.

      b.   At approximately 3:52 p.m., SEI and P.A. arrived
at 1370 N St Andrews Pl, Los Angeles, CA 90028. This location is
a business known as Second Home, an office space rental service
with multiple locations including this location in Hollywood.
TFO Vinh Do saw SEI exiting the driver's side of the SUBJECT
VEHICLE and going into the building carrying what appeared to
be a black laptop bag and a silver bottle. TFO Alvarado saw P.A.
exiting the passenger side and entering the driver's seat of the
SUBJECT VEHICLE. P.A. then departed from the location in the
SUBJECT VEHICLE but investigators stayed with SEI.

      c.   At approximately 5:45 p.m., while acting in an
undercover ("UC") capacity, I initiated a text message
conversation with SEI using his known telephone number of 732-
763-1328. This phone number is linked to iCloud Account 3. This
conversation is detailed further below.

      d.   At approximately 7:35 p.m., I saw SEI through a
window on the north side of the Second Home building. I saw SEI
using what appeared to be a cell phone and a laptop. SEI
appeared to be operating the phone frequently and may have also
taken a phone call.

e.  At approximately 7:55 p.m., I saw SEI getting his stuff together and walking southbound through the building and out of view.

f.  At approximately 8:11 p.m., I saw the SUBJECT VEHICLE arriving and TFO Alvarado saw it parking on N St Andrews Pl facing north. P.A. was driving the SUBJECT VEHICLE.

g.  At approximately 8:14 p.m., TFO Alvarado saw SEI entering the passenger side of the SUBJECT VEHICLE and heading north on N St Andrews Pl, then east on DeLongpre Ave, and then signaling to go south on Western Ave. Investigators followed the vehicle away from this location and maintained surveillance of it.

h.  At approximately 8:26 p.m., TFO Carlos Bedolla saw the SUBJECT VEHICLE traveling south on S St Andrews Pl from 3rd St and entering the southern most garage entrance at the SUBJECT PREMISES. The SUBJECT VEHICLE parked in its normal spot.

91.  Further review of the cell-site data during periods when surveillance was concluded while prospective cell-site data was actively being received shows SEI's phone predominantly remaining in the location consistent with the SUBJECT PREMISES. However, at times SEI appeared to be active in the late-night hours in various locations near the Hollywood and West LA areas, similar to TODOROVA.

6.  <u>SEI recently identified himself in response to an undercover communication sent to SEI's phone number linked to iCloud Account 3</u>

92.  As referenced above, on September 23, 2021, while conducting active surveillance of SEI, I sent a text message

acting in an undercover capacity to SEI's phone number linked to iCloud Account 3. In this text message conversation, as a response to SEI asking, "I'm sorry who is this?," I said "Kather right? One of my buddies passed me your number." SEI responded in the affirmative to the Kather reference with "Yup!" As noted above, I later reviewed toll records for SEI's phone linked to iCloud Account 3 for this time period and confirmed that the text messages between myself and SEI were logged on the toll records. As also noted above, SEI goes by "Kather" which is also reflected in his known email address: kathersei@yahoo.com.

**J.    Courier A Identifies TODOROVA as Provider of Drugs and DTO Cellphone**

93.   On October 22, 2021, SA Howell and I interviewed Courier A. On November 15, 2021, IRS Fellows and I interviewed Courier A. As described above, I previously identified Courier A as a suspected "Driver" for TODOROVA's DTO. During the collective interviews, Courier A stated the following in sum and substance:

a.    Prior to working for TODOROVA, Courier A and Courier A's significant other ("Individual A") had been introduced to TODOROVA through a former roommate. The former roommate had been a customer of TODOROVA for several months before moving away. Individual A claimed to have ordered from TODOROVA a couple of times and that TODOROVA would do the deliveries herself at night and that she drove a sedan. Courier A stated that the vehicle TODOROVA was delivering in was the same vehicle that Courier A later saw her driving when they

would meet up for work. Individual A passed the info to Courier A that TODOROVA needed a driver and Courier A reached out to TODOROVA on March 7, 2021, via iMessages, which I reviewed and confirmed as detailed below.

b.   On March 10, 2021, as described above, fellow investigators and I saw Courier A meet with TODOROVA. In the interviews, Courier A described this as the first day of work and that TODOROVA conducted a training before sending Courier A out to work that night. At the time of the above described traffic stop, Courier A claimed to have had a work cell phone and illegal drugs in the car, both provided by TODOROVA.

c.   Courier A shared access to Courier A's personal cell phone and allowed me to photograph the messages. I confirmed that TODOROVA's phone number was saved as the phone number for the contact "mimi" in Courier A's phone. Tolls also confirm numerous contacts between Courier A and TODOROVA during the period of March 10-13, 2021. I also reviewed the text messages, which show Courier A and TODOROVA discussing the working arrangement, the days and hours needed, agreeing to meet up for training on March 10, 2021, providing a drug menu, and communicating while Courier A was working as a drug delivery driver for TODOROVA. The drug menu TODOROVA sent Courier A including several drugs in coded language, including but not limited to cocaine, ketamine, and molly (MDMA). Several key messages from TODOROVA excerpted below show TODOROVA's actions in furtherance of the TODOROVA DTO:

i.  "Sometimes I like to help you with the texting, if I can" (10:32 p.m., March 10, 2021)

ii.  "Oh and with you, no discounts unless I've texted the client otherwise" (10:59 p.m., March 10, 2021)

iii. "See you back at my place 2am" (11:17 p.m., March 10, 2021)

iv.  "Ok when you run out[40] come back to my place" (11:32 p.m., March 10, 2021)

v.  "Next do Tom, Matt, (510) number and Leo. I'll[41] go see the 323 number and the 818 number" (9:09 p.m., March 11, 2021)

vi.  "My goal is always to have you take care of as many clients as possible before you get tired around 2 or 230am" (1:53 a.m., March 12, 2021)

vii. "Ok sure let's meet at my place" (1:54 a.m., March 12, 2021)

viii.   "I hope you're ok. I had to pay my cell phone[42] bill just now" (2:07 a.m., March 12, 2021)

d.   I believe that the above messages from TODOROVA show several important points. TODOROVA would communicate with clients and customers while Courier A was also communicating

---

[40] In reference to a previous message from Courier A indicating low quantities remaining of "c" which I believe to be cocaine.

[41] TODOROVA and Courier A were working at the same time. As can be seen in this message, TODOROVA would sometimes work at the same time as the drivers and they would split up to cover the orders during the work period. Shared contacts and messages via iCloud Account 1 made this possible.

[42] I believe this is TODOROVA claiming to pay the cell phone bill for her phone number linked to iCloud Account 1.

with them. This was possible due to a shared iCloud account that the work phone was logged into, according to Courier A. I believe this to be iCloud Account 1. TODOROVA specifically mentioned that she would have to give clients a discount, demonstrating that she was in charge of the distribution and finances, not the driver/courier. TODOROVA had control over the illegal drugs and was able to resupply Courier A when running low and told Courier A to come to "my place" when out. According to Courier A, they would meet in the Carlos Ave area where Courier A and TODOROVA were observed on March 10, 2021, next to Todorova's Apartment building. TODOROVA paid for her own cell phone bill, which I believe to be linked to iCloud Account 1.

  e. Courier A also allowed me to photograph saved screenshots and photos on a personal laptop that depicted further information regarding working for TODOROVA, including the last night of work in which Courier A's vehicle was damaged during an attempted carjacking and/or robbery in Venice, CA after finishing a delivery. This incident occurred in the early morning hours of March 13, 2021. As described above, Courier A worked three shifts for TODOROVA over the period of March 10-13, 2021.

  f. While Courier A was working, some of the most popular illegal drugs ordered were cocaine, ketamine, molly, and pink 2CB, a synthetic form of cocaine. Courier A stopped working for TODOROVA after being attacked in an attempted carjacking/robbery in Venice, CA in the early morning hours of March 13, 2021, following a delivery in the area.

94.   Based on all the above and my training and experience,
I believe the following:

        a.   SEI used his cellphone, linked to iCloud Account
3, to facilitate the commission of federal crimes in the Central
District of California, specifically, working as a
driver/courier for TODOROVA, to deliver counterfeit pills, which
later tested positive for the presence of fentanyl, and cocaine,
which was later traded for more of the counterfeit pills, to
R.M. at his home in Beverly Hills, California on the night and
early morning prior to his death. Additionally, SEI used Digital
Device 1 to aid in the commission of these crimes;

        b.   SEI used his SUBJECT VEHICLE, registered to him
at the SUBJECT PREMISES, to facilitate the commission of these
crimes;

        c.   SEI recently identified himself to me via text
message from his cellphone, linked to iCloud Account 3, while I
was acting in an undercover capacity on September 23, 2021;

        d.   SEI likely stores and/or carries his cellphone,
linked to iCloud Account 3, on his person or within his SUBJECT
VEHICLE or SUBJECT PREMISES.

## V.   <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

95.   Based on my training and experience, conversations
with other experienced law enforcement officers, and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

        a.   Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-

level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds. Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

        b.    Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs. The aforementioned records are often maintained
where drug traffickers have ready access to them, such as on
their cell phones and other digital devices, and in their
residences and vehicles.

        c.    Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices. This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal. In
addition, it is common for people engaged in drug trafficking to
have photos and videos on their cell phones of drugs they or
others working with them possess, as they frequently send these
photos to each other and others to boast about the drugs or
facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on

their digital devices and in their residence and vehicles. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence and vehicles, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.   Drug traffickers often engage in quick, hand-to-hand transactions, utilizing vehicles, street meetings, etc., to limit time and exposure to potential witnesses to criminal activity and to avoid detection by law enforcement.

g.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

h.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence, in safes, or in vehicles. They also often keep other items related to their drug trafficking activities at their residence or in their vehicles, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

      i.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### I.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[43]

96. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      b.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary

---

[43] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

        c.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device. That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them. For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

        d.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it. For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

        e.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions. Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed. Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

97. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b.  Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

98. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SEI's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of SEI's face with his or her eyes open to activate the facial, iris, and/or retina-recognition feature.

99. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. REQUEST FOR NIGHTTIME SERVICE

100. I request that the Court authorize investigators to serve these warrants during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii). Good cause for nighttime service exists because investigation has shown that SEI is likely to be found at the SUBJECT PREMISES during the nighttime hours. Court authorized GPS location data showed SEI spending long periods of time at the SUBJECT PREMISES during the nighttime hours. Additionally, investigation has shown that SEI has traveled from the SUBJECT PREMISES to engage in suspected drug transactions, utilizing the SUBJECT VEHICLE, in the evening hours before returning to the SUBJECT PREMISES later in the night. In my training and experience and based on my conversations with other experienced law enforcement officers, individuals who traffick drugs take many efforts to protect their illicit product, which include conducting counter-surveillance in an attempt to identify or protect against potential burglary and robbery by competing drug dealers and other criminal elements, or to defend against search warrants or raids by law enforcement officers. In doing so, drug traffickers create a high-risk situation in which both criminal elements and law enforcement can be the target of violence upon approach and entry into residences to effectuate valid search warrants. A means of mitigating that potential threat in this case would be

the granting of nighttime service. Nighttime service will give law enforcement the ability to get within close proximity of the SUBJECT PREMISES if SEI is at home and likely tired or asleep. The ability to serve the requested warrants at night will provide law enforcement with a better opportunity to enter the SUBJECT PREMISES without incident to ensure everyone's safety. Given these facts, I believe that nighttime service is warranted in this case.

## VII. <u>REQUEST FOR SEALING</u>

101. Because the requested arrest and search warrants have not yet been executed, and this investigation is ongoing, I request that this affidavit be sealed at this time. Disclosure of the affidavit at this time would seriously jeopardize the ongoing investigation, including the requested search warrants as well as investigation and identification of co-conspirators, and may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight from prosecution. Therefore, I request that the affidavit be sealed to avoid the opportunity for destruction of evidence, changed patterns of behavior, and flight from prosecution.

//

### VIII.     CONCLUSION

102. For all the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the person, premises, and vehicle described in Attachments A-1 to A-3.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 1st day of
December, 2021.

*Patricia Donahue*
_____
HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE

# Magistrate Judge Case Initiating Documents

[2:21-mj-05453 USA v. Search Warrant](#)

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

## Notice of Electronic Filing

The following transaction was entered by Castaneda, Patrick on 12/1/2021 at 2:51 PM PST and filed on 12/1/2021

**Case Name:**          USA v. Search Warrant
**Case Number:**        [2:21-mj-05453](#)
**Filer:**              USA
**Document Number:** [1](#)

**Docket Text:**
**APPLICATION for Search Warrant filed by Plaintiff USA. (Not for Public View pursuant to the E-Government Act of 2002) (Attachments: # (1) Proposed Warrant) (Attorney Patrick Castaneda added to party USA(pty:pla)) (Castaneda, Patrick)**

**2:21-mj-05453-1 Notice has been electronically mailed to:**

**2:21-mj-05453-1 Notice has been delivered by First Class U. S. Mail or by other means <u>BY THE FILER</u> to :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\2-21-MJ-05453.Application For SW A-1.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=12/1/2021] [FileNumber=33042067-0
] [7d105d7a0d0195c300187a6a120a26a32a76dc4014d8f7d7c9ee9405b9af8c4fad0
b9d56de73802f7e0530fddeb343b38820c382dc38651a203f30e91d12f47f]]
**Document description:**Proposed Warrant
**Original filename:**C:\fakepath\2-21-MJ-05453.Search Warrant A-1.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=12/1/2021] [FileNumber=33042067-1
] [93c199fab72fb48ff9e958f931206280feb341ed1174b58cd9fb45c9087aaceeea4
e60d21ab0f37c663eaadbb98f35cc7ad737ae3be7bb544f55bb8aa343d87f]]